# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEORGE SHELDON JERCICH, | Case No. 1:18-cv-00032-LJO-EPG-PC |
| Plaintiff, | FINDINGS AND RECOMMENDATION TO GRANT DEFENDANTS' MOTIONS TO DISMISS WITH LEAVE TO AMEND EIGHTH AMENDMENT MEDICAL CARE CLAIM REGARDING THE ALLEGED FAILURE TO CONDUCT A CONCUSSION EXAMINATION |
| v. | |
| CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION, et al., | |
| Defendants. | (ECF Nos. 46, 47) |
| | OBJECTIONS, IF ANY, DUE WITHIN THIRTY DAYS |

George Sheldon Jercich ("Plaintiff") is a former state prisoner proceeding *pro se* with this civil rights action pursuant to 42 U.S.C. § 1983. This case now proceeds on Plaintiff's Third Amended Complaint. (ECF No. 45). Before the Court are Defendants' motions to dismiss for failure to state facts sufficient to state a claim for relief. (ECF Nos. 46, 47). For the reasons described below, the undersigned will recommend that the motions to dismiss be granted.

## I. BACKGROUND

Plaintiff filed the Complaint commencing this action on January 5, 2018. (ECF No. 1). On March 2, 2018, Plaintiff filed a motion for leave to file a First Amended Complaint ("FAC") along with a FAC. (ECF No. 19). On March 5, 2018, Plaintiff requested leave to file a Second Amended Complaint ("SAC"). (ECF No. 20). On March 6, 2018, Plaintiff lodged the SAC. (ECF No. 21). On March 8, 2018, the Court granted Plaintiff's motion to file the SAC. (ECF No. 22).

Two motions to dismiss the SAC were filed. (ECF Nos. 33, 38). On November 29, 2018, the Court granted Plaintiff's motion to file a Third Amended Complaint. (ECF No. 43). Accordingly, the pending motions to dismiss were denied as moot. (ECF No. 44). On January 4, 2019, Plaintiff filed the Third Amended Complaint ("TAC"). (ECF No. 45).

On January 17, 2019, Defendants California Department of Corrections and Rehabilitation ("CDCR"), Alfaro, Cimental, Hill, Kernan, Ortega, Owolabi, Smith, Sullivan, Wood, and Zollinger (collectively "CDCR Defendants") filed a motion to dismiss the TAC for failure to state a claim. (ECF No. 46). CDCR Defendants argue that the TAC "contains few to no specific factual allegations against any of the Defendants" and the "factual allegations that are present are insufficient to state any claim for relief." (ECF No. 46-1 at 2).[1]

On January 24, 2019, Defendants Steven Yaplee, M.D. and George Yaplee Medical Center, Inc., dba Triangle Eye Institute filed a motion to dismiss the TAC for failure to state a claim. (ECF No. 47). Therein, Defendants argue "[t]here are essentially no factual / substantive allegations of civil rights violations or even professional negligence against the moving Defendants, and the factual allegations that *are* present are insufficient to state any claim for relief against moving defendants." (ECF No. 47-1 at 3).

Plaintiff filed oppositions to the motions to dismiss, and CDCR Defendants filed a reply. (ECF Nos. 49–51).

## II.     SUMMARY OF PLAINTIFF'S THIRD AMENDED COMPLAINT

Plaintiff was processed at North Kern State Prison ("NKSP") on June 26, 2014, and when asked, he showed Receiving and Release ("R&R") personnel his identifying documents that indicated Plaintiff was seventy-five years old. (ECF No. 45 at 4). Upon Plaintiff's arrival at NKSP, "he was wearing his own 'non-weaponizable,' size 15, black canvas, near-new shoes," but Plaintiff was forced to throw them away. Instead, NKSP R&R personnel issued Plaintiff a pair of size twelve slippers and told Plaintiff to fold down the backs of the slippers when Plaintiff complained they were too small. (Id. at 7–8). Plaintiff wore the size twelve slippers for approximately three months until he was able to trade slippers with another prisoner that fit

---

[1] Page numbers refer to the ECF page numbers stamped at the top of the page.

better but were still too small. During Plaintiff's nineteen months in custody, Plaintiff lost at least three toenails. For nearly three years after Plaintiff's release, Plaintiff had one partial and blackened toenail that would not grow back properly. (Id. at 8).

After a review of Plaintiff's papers, NKSP personnel placed Plaintiff in "mainline" housing despite his elder abuse conviction. (ECF No. 45 at 14–15). Plaintiff was assigned bunk 72-L, which had been previously occupied by "Kory," a white inmate between twenty-five to thirty-five years old who had "KORY" tattooed on his stomach. Kory informed Plaintiff that it was customary for new inmates to show their papers to the leader in the area, and the two exchanged papers. (ECF No. 45 at 15). When Kory saw Plaintiff's elder abuse conviction, Kory "stated he had to show the papers to the 'White Shot-caller.'" (Id. at 16). Kory took Plaintiff's papers and returned ten minutes later, informing Plaintiff, "Everything is cool." (Id.). Although Plaintiff offered to further explain his conviction to the shot-caller, Kory said it would not be necessary. Plaintiff then fell asleep for an hour or two. (Id.).

When Plaintiff awoke, he was attacked from behind and struck on the head seven times. Plaintiff was temporarily knocked out. A guard then told Plaintiff to gather his belongings because he was going to "Medical." (ECF No. 45 at 16). As he was leaving, Plaintiff heard Kory shout words to the effect of, "Get out of here, they are going to kill you." (Id. at 17). A CDCR sergeant[2] appeared and told Plaintiff to follow him. Plaintiff was led to a nearby medical facility where Plaintiff was told to lie down on a hospital-type bed and a female nurse inspected him. Plaintiff alleges that his two front teeth were "severely loosened" and that he knew he had a concussion. However, the nurse and Defendant Smith, who was present for the inspection, ignored Plaintiff's request for a concussion examination. (Id. at 17).

Defendant Smith then placed Plaintiff in a "phone-booth-sized" holding cell where Plaintiff had to stand. (ECF No. 45 at 18). Plaintiff demanded he be examined for a concussion and informed the sergeant that his vision was blurry. Defendant Smith refused Plaintiff's attempts to get a concussion inspection and told Plaintiff that he was not experiencing blurry

---

[2] At the time, Plaintiff was not able to read the sergeant's name tag, but when Plaintiff saw the sergeant at a later date, Plaintiff was able to see that the sergeant's name tag read "Smith." (ECF No. 45 at 17, 20).

vision but that it only appeared so because Plaintiff was looking through "expanded metal." (Id.). When Plaintiff told Smith he wished to press charges against Kory and the assailant, the sergeant told him that it would be impossible to determine who beat Plaintiff and that Kory was not involved. (Id. at 18–19). Plaintiff remained in the holding cell for approximately a half hour and was later transferred to "C-W," a Special Needs Yard ("SNY") dorm. (Id. at 19). Although things went well in the SNY dorm, Plaintiff was not clear-headed for two to three days and he did not feel well for a couple of weeks. (Id. at 20).

In mid-July 2014, Correctional Captain Ortega interviewed Plaintiff regarding the incident for a half hour. Defendant Ortega then asked Plaintiff to sign a letter asking to be placed in SNY, where Plaintiff already was. (ECF No. 45 at 20).

To Plaintiff's knowledge, during Plaintiff's stay at NKSP Correctional Officer Zollinger was the regular second watch staff member in charge of dorm "C-W." When Plaintiff informed Defendant Zollinger that he was thinking of complaining about R&R and Sergeant Smith to the warden, Zollinger advised Plaintiff not to file a 602 grievance[3] with the warden, but to send a "Request" to Zollinger. (ECF No. 45 at 21). Although Plaintiff followed Zollinger's advice, Plaintiff believes it was in error because: Plaintiff was never evaluated for the prolonged effects from the concussion he sustained on June 26, 2014; he had no proper shoes; to Plaintiff's knowledge, Sergeant Smith was not reprimanded and R&R personnel were not told to correct their flawed procedures; and Plaintiff's civilian clothes (which disappeared from R&R) and shoes were never returned. (Id. at 21–22).

Plaintiff alleges that "each and every time Plaintiff filed an Inmate/Parolee Appeal (Form 602)"—whether regarding his civilian clothing and shoes, his beating, or subsequent medical issues—said grievances "were grossly mishandled or ignored or both." (ECF No. 45 at 23).

Plaintiff asserts that the CDCR failed to provide proper medical attention to Plaintiff's needs, including the possibility of prostate cancer. (ECF No. 45 at 24). Upon his entry into CDCR's custody, Plaintiff had thyroid, prostate, high blood pressure, and cholesterol issues, all of which required special attention and medication. (Id. at 7). Plaintiff alleges that despite

---

[3] Inmate appeals or grievances are made on a CDCR form 602 and are also referred to as "602s."

knowing Plaintiff's advanced age and enlarged prostate issues, the CDCR failed to test him for prostate cancer during his incarceration, leading Plaintiff to develop late-stage cancer in his prostate that required forty radiation treatments after he was released. (Id. at 7).

Plaintiff further asserts that he was not offered proper and timely dental care. (ECF No. 45 at 24). Plaintiff attempted to save the two teeth that were severely loosened during his June 26, 2014 attack by "taking intensive care of them for over a year," but eventually pulled them out in the third quarter of 2015 "when it became obvious to him the teeth were not going to naturally tighten." (ECF No. 45 at 25). When Plaintiff sought assistance with his teeth, Plaintiff was informed that he would have to wait until he was assigned to his "endorsed" prison stop before he could receive assistance. At the California Correctional Institution ("CCI") in Tehachapi, Plaintiff was offered a root canal procedure. Plaintiff questioned the dental staff regarding the root canal as he believed the proper care should have included pulling out the two teeth and being provided a partial plate. (Id.). Plaintiff believed that the staff, despite knowing that the partial plate procedure was correct and necessary, wished to perform the root canal because the procedure could be done at the prison while a partial plate procedure would have to be performed outside the prison by a contract dentist. Plaintiff alleges that the dental facility supervisor, Bonnie Cimental, was part and party to these conversations and decisions. (Id. at 25–26).

While at NKSP, Plaintiff elected to undergo cataract removal and corrective implant surgery after reading literature at the medical facility that Dr. Steven M. Yaplee, a Board-Certified Ophthalmologist at the Triangle Eye Institute, offered inmates free cataract removal and correction implant surgery. (ECF No. 45 at 26–27). The first procedure was performed on Plaintiff's right eye in late 2014 at the Triangle Eye Institute facility in Delano while Plaintiff was housed at NKSP. The second procedure was performed in early 2015 while Plaintiff was housed at CCI. Although Plaintiff initially was satisfied with the results of the operations, Plaintiff subsequently began to experience some discomfort in his left eye in late 2015. Plaintiff's multiple appeals to see Dr. Yaplee were ignored by prison personnel. (Id. at 27–28).

Plaintiff was released from prison on January 7, 2016. Approximately six months thereafter Plaintiff attempted to telephonically contact Dr. Yaplee. Plaintiff called Defendant

Yaplee's Delano office twice, informing the receptionist that he had two surgeries while incarcerated and that the vision in his left eye had deteriorated and was causing him issues particularly while reading or working at his computer. Plaintiff asked to see Defendant Yaplee again to have his left eye reevaluated and corrected. (ECF No. 45 at 28). The receptionist informed Plaintiff that he could not visit the doctor unless Plaintiff paid a fee. Plaintiff protested, stating that he was not asking for "new work" but rather "for the doctor to correct the work he had already done." (Id. at 29). In late 2017, Plaintiff passed through Delano and Bakersfield on his vacation to the Grand Canyon. He stopped at Defendant Yaplee's Delano office and met with the receptionist he previously spoke with on the telephone. The receptionist asked to see Plaintiff's insurance information and informed Plaintiff that his State-paid insurance was only good in Central California and that Dr. Yaplee only accepted said insurance from parties living in the more southern districts in which the doctor's offices were located. (ECF No. 45 at 29).

Plaintiff learned from the receptionist that Defendant Yaplee's wife worked as the head administrative employee in the Bakersfield office. (ECF No. 45 at 29). Plaintiff talked with Mrs. Yaplee on the telephone, informing her that he was having blurred vision in his left eye and "wanted Dr. Yaplee to look at it, and do whatever was necessary, at the doctor's cost, to correct the work he had done." (Id. at 30). Mrs. Yaplee informed Plaintiff that if he wished to see Dr. Yaplee, he would have to pay a fee. This was the last contact Plaintiff attempted with Defendant Yaplee's office. (Id.).

Plaintiff has seen two ophthalmologists in Merced. (ECF No. 45 at 30). One of the ophthalmologists evaluated Plaintiff, noting that Plaintiff has a "cloudy" condition behind the implanted lens in his left eye that needs correction and a minor amount of cloudiness behind the implanted lens in his right eye. (Id. at 31).

## III.    LEGAL STANDARDS

### A. Motion to Dismiss

In considering a motion to dismiss, the Court must accept all allegations of material fact in the complaint as true. Erickson v. Pardus, 551 U.S. 89, 93–94 (2007); Hosp. Bldg. Co. v. Rex Hosp. Trustees, 425 U.S. 738, 740 (1976). The Court must also construe the alleged facts in the

light most favorable to the plaintiff. <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974), <u>abrogated on other grounds by</u> <u>Harlow v. Fitzgerald</u>, 457 U.S. 800 (1982); <u>Barnett v. Centoni</u>, 31 F.3d 813, 816 (9th Cir.1994) (per curiam). All ambiguities or doubts must also be resolved in the plaintiff's favor. <u>See</u> <u>Jenkins v. McKeithen</u>, 395 U.S. 411, 421 (1969). In addition, *pro se* pleadings "must be held to less stringent standards than formal pleadings drafted by lawyers." <u>Hebbe v. Pliler</u>, 627 F.3d 338, 342 (9th Cir. 2010).

A motion to dismiss pursuant to Rule 12(b)(6) operates to test the sufficiency of the complaint. <u>See</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 679 (2009). Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." <u>Scheuer</u>, 416 U.S. at 236.

The first step in testing the sufficiency of the complaint is to identify any conclusory allegations. <u>Iqbal</u>, 556 U.S. at 679. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Id.</u> at 678 (citing <u>Twombly</u>, 550 U.S. at 555). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Twombly</u>, 550 U.S. at 555 (citations and quotation marks omitted).

After assuming the veracity of all well-pleaded factual allegations, the second step is for the court to determine whether the complaint pleads "a claim to relief that is plausible on its face." <u>Iqbal</u>, 556 U.S. at 678 (citing <u>Twombly</u>, 550 U.S. at 556) (rejecting the traditional 12(b)(6) standard set forth in <u>Conley</u>, 355 U.S. at 45–46). A claim is facially plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678 (citing <u>Twombly</u>, 550 U.S. at 556). The standard for plausibility is not akin to a "probability requirement," but it requires "more than a sheer possibility that a defendant has acted unlawfully." <u>Iqbal</u>, 556 U.S. at 678.

*///*

In deciding a Rule 12(b)(6) motion, the Court generally may not consider materials outside the complaint and pleadings. Cooper v. Pickett, 137 F.3d 616, 622 (9th Cir. 1998); Gumataotao v. Dir. of Dep't of Revenue & Taxation, 236 F.3d 1077, 1083 (9th Cir. 2001).

**B. Supervisory Liability**

Supervisory personnel are generally not liable under § 1983 for the actions of their employees under a theory of *respondeat superior* and, therefore, when a named defendant holds a supervisory position, the causal link between him and the claimed constitutional violation must be specifically alleged. Iqbal, 556 U.S. at 676–77; Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979); Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978). To state a claim for relief under § 1983 based on a theory of supervisory liability, Plaintiff must allege some facts that would support a claim that the supervisory defendants either: personally participated in the alleged deprivation of constitutional rights; knew of the violations and failed to act to prevent them; or promulgated or "implemented a policy so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'" Hansen v. Black, 885 F.2d 642, 646 (9th Cir. 1989) (internal citations omitted); Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). For instance, a supervisor may be liable for his "own culpable action or inaction in the training, supervision, or control of his subordinates," "his acquiescence in the constitutional deprivations of which the complaint is made," or "conduct that showed a reckless or callous indifference to the rights of others." Larez v. City of Los Angeles, 946 F.2d 630, 646 (9th Cir. 1991) (internal citations, quotation marks, and alterations omitted).

**C. Eighth Amendment**

    1. Conditions of Confinement

"It is undisputed that the treatment a prisoner receives in prison and the conditions under which [the prisoner] is confined are subject to scrutiny under the Eighth Amendment." Helling v. McKinney, 509 U.S. 25, 31 (1993); see also Farmer v. Brennan, 511 U.S. 825, 832 (1994). Conditions of confinement may, consistent with the Constitution, be restrictive and harsh. See Rhodes v. Chapman, 452 U.S. 337, 347 (1981); Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006); Osolinski v. Kane, 92 F.3d 934, 937 (9th Cir. 1996); Jordan v. Gardner, 986 F.2d

1521, 1531 (9th Cir. 1993) (en banc). Prison officials must, however, provide prisoners with "food, clothing, shelter, sanitation, medical care, and personal safety." Toussaint v. McCarthy, 801 F.2d 1080, 1107 (9th Cir. 1986), abrogated in part on other grounds by Sandin v. Connor, 515 U.S. 472 (1995); see also Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000); Hoptowit v. Ray, 682 F.2d 1237, 1246 (9th Cir. 1982); Wright v. Rushen, 642 F.2d 1129, 1132-33 (9th Cir. 1981).

Two requirements must be met to show an Eighth Amendment violation. Farmer, 511 U.S. at 834. "First, the deprivation must be, objectively, sufficiently serious." Id. (internal quotation marks and citation omitted). Second, "prison officials must have a sufficiently culpable state of mind," which for conditions of confinement claims, "is one of deliberate indifference." Id. (internal quotation marks and citation omitted). Prison officials act with deliberate indifference when they know of and disregard an excessive risk to inmate health or safety. Id. at 837. The circumstances, nature, and duration of the deprivations are critical in determining whether the conditions complained of are grave enough to form the basis of a viable Eighth Amendment claim. Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2006). Mere negligence on the part of a prison official is not sufficient to establish liability, but rather, the official's conduct must have been wanton. Farmer, 511 U.S. at 835; Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998).

2.  Duty to Protect

The Eighth Amendment requires, *inter alia*, that prison officials "take reasonable measures to guarantee the safety of the inmates." Farmer v. Brennan, 511 U.S. 825, 832 (1994) (internal quotation marks omitted) (quoting Hudson v. Palmer, 468 U.S. 517, 526–27 (1984)). "The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed an inmate to sufficiently substantial 'risk of serious damage to his future health.'" Farmer, 511 U.S. at 843 (quoting Helling v. McKinney, 509 U.S. 25, 35 (1993)).

A prison official violates this duty when two requirements are met. First, objectively viewed, the prison official's act or omission must cause "a substantial risk of serious harm." Farmer, 511 U.S. at 834. Second, the official must be subjectively aware of that risk and act with

"deliberate indifference to inmate health or safety." Id. at 834, 839–40 (internal quotation marks omitted). In other words, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. Deliberate indifference is "something more than mere negligence: but "something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Id. at 835. A prison official's deliberate indifference may be established through an "inference from circumstantial evidence" or "from the very fact that the risk was obvious." Id. at 842.

### 3. Medical Care

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). This requires Plaintiff to show (1) "a 'serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain,'" and (2) that "the defendant's response to the need was deliberately indifferent." Jett, 439 F.3d at 1096 (quoting McGuckin v. Smith, 974 F.2d 1050, 1059–60 (9th Cir. 1992), overruled on other grounds by WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc)).

Deliberate indifference is established only where the defendant subjectively "knows of and disregards an excessive risk to inmate health and safety." Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) (internal quotation mark omitted) (quoting Gibson v. County of Washoe, Nevada, 290 F.3d 1175, 1187 (9th Cir. 2002)). Deliberate indifference can be established "by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." Jett, 439 F.3d at 1096 (citation omitted). Civil recklessness (failure "to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known") is insufficient to establish an Eighth Amendment violation. Farmer, 511 U.S. at 836–37.

A difference of opinion between an inmate and prison medical personnel—or between medical professionals—regarding appropriate medical diagnosis and treatment is not enough to

establish a deliberate indifference claim. <u>Sanchez v. Vild</u>, 891 F.2d 240, 242 (9th Cir. 1989); <u>Toguchi</u>, 391 F.3d at 1058. Additionally, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." <u>Estelle</u>, 429 U.S. at 106. To establish a difference of opinion rising to the level of deliberate indifference, a "plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances." <u>Jackson v. McIntosh</u>, 90 F.3d 330, 332 (9th Cir. 1996).

### D. Inmate Grievances

Prison officials' actions in responding to a prisoner's grievance, alone, cannot give rise to any claims for relief under § 1983 for violation of due process. "[A prison] grievance procedure is a procedural right only, it does not confer any substantive right upon the inmates." <u>Buckley v. Barlow</u>, 997 F.2d 494, 495 (8th Cir. 1993) (citing <u>Azeez v. DeRobertis</u>, 568 F. Supp. 8, 10 (N.D. Ill. 1982)); <u>see also</u> <u>Ramirez v. Galaza</u>, 334 F.3d 850, 860 (9th Cir. 2003) (no liberty interest in processing of appeals because no entitlement to a specific grievance procedure); <u>Massey v. Helman</u>, 259 F.3d 641, 647 (7th Cir. 2001) (existence of grievance procedure confers no liberty interest on prisoner); <u>Mann v. Adams</u>, 855 F.2d 639, 640 (9th Cir. 1988). "Hence, it does not give rise to a protected liberty interest requiring the procedural protections envisioned by the Fourteenth Amendment." <u>Azeez</u>, 568 F. Supp. at 10; <u>Spencer v. Moore</u>, 638 F. Supp. 315, 316 (E.D. Mo. 1986).

While inmates have a constitutional right of access to the courts, <u>Lewis v. Casey</u>, 518 U.S. 343, 346 (1996), which extends to established grievance procedures, <u>Bradley v. Hall</u>, 64 F.3d 1276, 1279 (9th Cir.1995), <u>overruled on other grounds by</u> <u>Shaw v. Murphy</u>, 532 U.S. 223, 230 n.2 (2001), the right is merely to bring to court a grievance the inmate wishes to present and is limited to direct criminal appeals, habeas petitions, and civil rights actions. <u>Lewis</u>, 518 U.S. at 354. To bring a claim for deprivation of access to the courts, a plaintiff must have suffered an actual injury by being shut out of court. <u>Christopher v. Harbury</u>, 536 U.S. 403, 415 (2002); <u>Lewis</u>, 518 U.S. at 351.

**E.  Deprivation of Property**

The Due Process Clause protects prisoners from being deprived of property without due process of law, Wolff v. McDonnell, 418 U.S. 539, 556 (1974), and prisoners have a protected interest in their personal property, Hansen v. May, 502 F.2d 728, 730 (9th Cir. 1974). "[T]he Due Process Clause is . . . not implicated by a *negligent* act of an official causing unintended loss of or injury to . . . property." Daniels v. Williams, 474 U.S. 327, 328 (1986). Authorized intentional deprivation of property pursuant to an established state procedure is actionable under the Due Process Clause. See Hudson v. Palmer, 468 U.S. 517, 532 & n.13 (1984) (citing Logan v. Zimmerman Brush Co., 455 U.S. 422, 435-36 (1982)); Quick v. Jones, 754 F.2d 1521, 1524 (9th Cir. 1985). On the other hand, "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." Hudson, 468 U.S. at 533. California law provides a postdeprivation remedy for any property deprivations. Barnett v. Centoni, 31 F.3d 813, 816–17 (9th Cir. 1994) (citing Cal. Gov't Code §§ 810–95).

**IV.    DISCUSSION**

**A.  Defendant CDCR**

Plaintiff names the CDCR as a defendant. CDCR Defendants argue that Plaintiff is precluded from bringing suit for monetary damages against the CDCR, which is a state agency. (ECF No. 46-1 at 7).

The Eleventh Amendment prohibits federal courts from hearing suits brought against an unconsenting state. Brooks v. Sulphur Springs Valley Elec. Co., 951 F.2d 1050, 1053 (9th Cir. 1991) (internal citations omitted); see also Tennessee v. Lane, 541 U.S. 509, 517 (2004); Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 267–68 (1997); Clark v. California, 123 F.3d 1267, 1269 (9th Cir. 1997). The Eleventh Amendment bars suits against state agencies as well as those where the state itself is named as a defendant. See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 144 (1993); Beentjes v. Placer Cnty. Air Pollution Control Dist., 397 F.3d 775, 777 (9th Cir. 2005); Savage v. Glendale Union High Sch., 343 F.3d 1036,

1   1040 (9th Cir. 2003); see also Lucas v. Dep't of Corr., 66 F.3d 245, 248 (9th Cir. 1995) (per

2   curiam) (stating that Board of Corrections is agency entitled to immunity); Taylor v. List, 880

3   F.2d 1040, 1045 (9th Cir. 1989) (concluding that Nevada Department of Prisons was a state

4   agency entitled to Eleventh Amendment immunity).

5          As the CDCR is a state agency, it is entitled to Eleventh Amendment immunity from suit.

6   Therefore, Plaintiff fails to state a claim against Defendant CDCR, and the motion to dismiss

7   should be granted with respect to Defendant CDCR.

8                         **B.  Defendant Alfaro**

9          Plaintiff alleges that as the warden of NKSP Defendant Alfaro "knew or should have

10  known the errors that occurred in NKSP's R&R department were being committed *by her policy*

11  *in her prison*, and she should not have allowed them to occur," specifying R&R personnel's

12  alleged violation of Plaintiff's right to "his prison proper, personal property and reasonable

13  protection." (ECF No. 45 at 22 (emphasis in original)). Plaintiff also alleges that Defendant

14  Alfaro is "responsible for his footwear issue," is responsible "for not having a concussion

15  protocol set up to handle head-trauma-circumstances such as the one in which the Plaintiff found

16  himself," and violated Plaintiff's right to appeal and due process. (ECF No. 45 at 8, 18, 23).

17  CDCR Defendants argue that the TAC's allegations that Defendant Alfaro should be held

18  responsible for the actions of other NKSP staff are insufficient to state any claim that Alfaro

19  personally acted to violate Plaintiff's constitutional rights. (ECF No. 46-1 at 6).

20         As Plaintiff does not allege that Defendant Alfaro *personally* participated in the alleged

21  constitutional violations (i.e., confiscating Plaintiff's property, issuing ill-fitting shoes, assigning

22  Plaintiff to "mainline" housing where he was attacked, failing to conduct a concussion

23  examination, mishandling Plaintiff's 602 grievances), Plaintiff must show that Defendant Alfaro

24  either knew of the alleged violations and failed to act to prevent them or promulgated or

25  implemented a policy so deficient that the policy itself is a repudiation of constitutional rights.

26  See Hansen, 885 F.2d at 646.

27         The TAC's allegations fail to show that Defendant Alfaro knew of the alleged violations

28  and failed to act to prevent them. For example, there are no allegations demonstrating that

Defendant Alfaro had notice of abuses or violations with respect to confiscation of inmates' personal property, issuance of inmate footwear, yard assignments of elderly inmates resulting in a substantial risk of serious harm, or improper institutional responses to potential concussions or inmate grievances.

The TAC's allegations also fail to show that Defendant Alfaro promulgated or implemented policies so deficient that the policies themselves are a repudiation of constitutional rights. The TAC alleges the CDCR "policies and protocol as to who went into SNY and who didn't was dangerous to some inmates, particularly those over 65 years of age," and "all of its higher personnel over whose desks policies involving the housing of inmates passed, were responsible for injuries to those inmates who should have had their special needs attended to from the time they walked in any CDC&R facility to the day they walked out." (Id. at 21).

The TAC does not contain factual allegations demonstrating that Defendant Alfaro, or any other prison official, was both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists for elderly inmates (or inmates convicted of elder abuse) and drew such an inference. See Farmer, 511 U.S. at 837.

Therefore, Plaintiff fails to state a claim against Defendant Alfaro, and the motion to dismiss should be granted with respect to Defendant Alfaro.

### C. Defendant Kernan

Plaintiff alleges that as Secretary of the CDCR Defendant Kernan was responsible "for not having a concussion protocol set up to handle head-trauma-circumstances such as the one in which the Plaintiff found himself," was responsible for not "having a set protocol for those who should have been placed in SNY," and violated Plaintiff's right to appeal and due process. (ECF No. 45 at 18, 20–21, 23).

As Plaintiff does not allege that Defendant Kernan *personally* participated in the alleged constitutional violations, Plaintiff must show that Defendant Kernan either knew of the violations and failed to act to prevent them or implemented a policy so deficient that the policy itself is a repudiation of constitutional rights.

The TAC's allegations fail to show that Defendant Kernan knew of the alleged violations

and failed to act to prevent them. For example, there are no allegations demonstrating that Defendant Kernan had notice of abuses or violations with respect to yard assignments of elderly inmates resulting in a substantial risk of serious harm or improper institutional responses to potential concussions or inmate grievances. The TAC's allegations also fail to show that Defendant Kernan promulgated or implemented policies so deficient that the policies themselves are a repudiation of constitutional rights, as set forth in section IV(B), *supra*.

Therefore, Plaintiff fails to state a claim against Defendant Kernan, and the motion to dismiss should be granted with respect to Defendant Kernan.

### D. Defendant Sullivan

In the TAC, Plaintiff asserts that he holds the warden at CCI, among others, "responsible for his footwear issues, because there were shoes at both institutions [NKSP and CCI] that would have been more amenable to the Plaintiff, but he could not get access to them." (ECF No. 45 at 8). Plaintiff also alleges that the warden at CCI violated his right to appeal and due process.

As Plaintiff does not allege that Defendant Sullivan *personally* participated in the alleged constitutional violations, Plaintiff must show that Defendant Sullivan either knew of the violations and failed to act to prevent them or implemented a policy so deficient that the policy itself is a repudiation of constitutional rights.

The TAC's allegations fail to show that Defendant Sullivan knew of the alleged violations and failed to act to prevent them. For example, there are no allegations demonstrating that Defendant Sullivan had notice of abuses or violations with respect to issuance of inmate shoes or improper institutional responses to inmate grievances. The TAC's allegations also fail to show that Defendant Sullivan promulgated or implemented policies so deficient that the policies themselves are a repudiation of constitutional rights.

Therefore, Plaintiff fails to state a claim against the warden at CCI, and the motion to dismiss should be granted with respect to Defendant Sullivan.

### E. Defendant Ortega

Plaintiff alleges that Defendant Ortega, among others, is responsible "for not having a concussion protocol set up to handle head-trauma-circumstances such as the one in which

15

1   Plaintiff found himself." (ECF No. 45 at 18). Plaintiff also alleges that in mid-July 2014,

2   Defendant Ortega interviewed Plaintiff regarding his assault for a half hour and then asked

3   Plaintiff to sign a letter asking to be placed in SNY, where Plaintiff already was. (Id. at 20). The

4   TAC alleges that Defendant Ortega violated Plaintiff's Eighth Amendment rights because the

5   CDCR "policies and protocol as to who went into SNY and who didn't was dangerous to some

6   inmates, particularly those over 65 years of age, and other categories of inmates who needed

7   special protection or their needs should have had special attention but didn't get it." (ECF No. 45

8   at 21). CDCR Defendants argue that the TAC identifies neither any misconduct on the part of

9   Defendant Ortega nor any harm that Plaintiff suffered as a result. (ECF No. 46-1 at 7).

10      As Plaintiff does not allege that Defendant Ortega *personally* participated in the alleged

11  constitutional violations, Plaintiff must show that Defendant Ortega either knew of the violations

12  and failed to act to prevent them or implemented a policy so deficient that the policy itself is a

13  repudiation of constitutional rights.

14      The TAC's allegations fail to show that Defendant Ortega knew of the alleged violations

15  and failed to act to prevent them. For example, there are no allegations demonstrating that

16  Defendant Ortega had notice of abuses or violations with respect to yard assignments of elderly

17  inmates resulting in a substantial risk of serious harm or improper institutional responses to

18  potential concussions. The TAC's allegations also fail to show that Defendant Ortega

19  promulgated or implemented policies so deficient that the policies themselves are a repudiation

20  of constitutional rights, as set forth in section IV(B), *supra*.

21      Therefore, Plaintiff fails to state a claim against Defendant Ortega, and the motion to

22  dismiss should be granted with respect to Defendant Ortega.

23          **F. Defendant Zollinger**

24      Plaintiff alleges that when he informed Defendant Zollinger that he was thinking of

25  complaining about R&R and Sergeant Smith to the warden, Zollinger advised Plaintiff not to file

26  a 602 grievance but to send a "Request" to Zollinger. Although Plaintiff followed Defendant

27  Zollinger's advice, Plaintiff did not receive any satisfactory response. Plaintiff asserts that

28  Defendant Zollinger violated his right to appeal. (ECF No. 45 at 21–22). CDCR Defendants

argue that there is no right to a particular appeals process in prison and note that Plaintiff does not allege that Defendant Zollinger intentionally misled Plaintiff. (ECF No. 46-1 at 10).

To the extent Plaintiff is attempting to base a due process claim on prison officials' failure to properly process or respond to his grievances, the TAC fails to state a cognizable claim as Plaintiff has neither a liberty interest nor a substantive right in inmate appeals. See Mann, 855 F.2d at 640 ("There is no legitimate claim of entitlement to a grievance procedure."). Therefore, Plaintiff fails to state a claim against Defendant Zollinger, and the motion to dismiss should be granted with respect to Defendant Zollinger.

### G. Defendant Wood

Plaintiff alleges that "each and every time Plaintiff filed an Inmate/Parolee Appeal (Form 602)"—whether regarding his civilian clothing and shoes, his beating, or subsequent medical issues—said grievances "were grossly mishandled or ignored or both." (ECF No. 45 at 23). Plaintiff alleges that the appeals coordinators at both NKSP and CCI, among others, violated Plaintiff's right to appeal and due process.

To the extent Plaintiff is attempting to base a due process claim on prison officials' failure to properly process or respond to his grievances, the TAC fails to state a cognizable claim as Plaintiff has neither a liberty interest nor a substantive right in inmate appeals. See Mann, 855 F.2d at 640. Therefore, Plaintiff fails to state a claim against the appeals coordinator, and the motion to dismiss should be granted with respect to Defendant Wood.

### H. Defendant Cimental

Plaintiff alleges that the June 26, 2014 attack resulted in two of his teeth being severely loosened. At CCI, Plaintiff was offered a root canal rather than a partial plate procedure, which Plaintiff contends was necessary and proper. Plaintiff alleges staff offered the root canal because it could be done at the prison while a partial plate would require a costlier off-site procedure with a contract dentist. Plaintiff claims that the dental facility supervisor, Bonnie Cimental, was part and party to these conversations and decisions. (ECF No. 45 at 25–26).

Although Plaintiff claims that "it was clear" a root canal would not "do him any long-term good," (ECF No. 45 at 25), the TAC does not allege that the root canal was medically

unacceptable under the circumstances. A difference of opinion between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment is not enough to establish a deliberate indifference claim. Sanchez, 891 F.2d at 242; Toguchi, 391 F.3d at 1058.

Therefore, Plaintiff fails to state a claim against Defendant Cimental, and the motion to dismiss should be granted with respect to Defendant Cimental.

### I.  Defendant Smith

Plaintiff alleges that following the assault, Defendant Smith led Plaintiff to a nearby medical facility where a female nurse inspected Plaintiff. Both the nurse and Defendant Smith, who was present for the inspection, ignored Plaintiff's request for a concussion examination. (ECF No. 45 at 17). Defendant Smith then placed Plaintiff in a "phone-booth-sized" holding cell where Plaintiff had to stand. When Plaintiff demanded he be examined for a concussion and informed the sergeant that his vision was blurry, Smith refused and told Plaintiff that he was not experiencing blurry vision but that it only appeared so because Plaintiff was looking through "expanded metal." (Id. at 18). CDCR Defendants argue that although the "allegations against Defendant Smith are significantly more extensive than against any other Defendants," Plaintiff fails to state a claim against Smith because he "neither identifies any constitutional right allegedly violated by Defendant Smith's actions nor any harm he suffered as a result." (ECF No. 46-1 at 12).

The TAC's allegations that Defendant Smith rebuffed Plaintiff's request for a concussion examination and complaints of blurry vision do not demonstrate that Smith subjectively knew of and disregarded an excessive risk to Plaintiff's health and safety. The challenged conduct occurred immediately after Defendant Smith took Plaintiff to a medical facility to be inspected by a nurse, who also had rejected Plaintiff's request for a concussion examination, and the TAC does not contain sufficient factual allegations to demonstrate the course of treatment the nurse chose was medically unacceptable. See Toguchi, 391 F.3d at 1057–58 (holding a difference in opinion between inmate and prison medical personnel regarding appropriate medical diagnosis and treatment is not enough to establish a deliberate indifference claim); Jackson, 90 F.3d at 332 (noting deliberate indifference is established when prison officials "deny, delay, or intentionally

18

interfere with medical treatment" and holding that to establish a difference in opinion rising to the level of deliberate indifference, a "plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances").

Plaintiff further alleges that when he told Defendant Smith he wished to press charges against Kory and the assailant, Smith told him that it would be impossible to determine who beat Plaintiff and that Kory was not involved. (ECF No. 45 at 18–19). Plaintiff alleges that most of what Defendant Smith told him were "falsehoods." (Id. at 19.) Although Defendant Smith's alleged falsehoods may have been an attempt to discourage Plaintiff from filing a grievance, the TAC fails to state a cognizable claim as Plaintiff has neither a liberty interest nor a substantive right in inmate appeals. See Mann, 855 F.2d at 640.

Therefore, Plaintiff fails to state a claim against Defendant Smith, and the motion to dismiss should be granted with respect to Defendant Smith. The Court has provided the pertinent legal standards above and will grant Plaintiff leave to amend his claim regarding the failure to conduct a concussion examination if he believes that additional true factual allegations would state an Eighth Amendment medical care claim according to the provided legal standards.

### J.  Defendants Hill and Owolabi

As argued by the CDCR Defendants, the TAC contains no specific factual allegations with respect to Defendant Hill and Defendant Owolabi. Therefore, the motion to dismiss should be granted with respect to these defendants. See Iqbal, 556 U.S. at 676 ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

### K.  Defendants Yaplee and Triangle Eye Institute

Plaintiff alleges that he was "denied proper follow up eye-care after a prison-contractor-ophthalmologist removed cataracts from each eye while plaintiff was incarcerated, a form of cruel and unusual punishment, and a violtion [sic] of Plaintiff's VIII and XIV Amendment rights; as the ophthalmologist was working under color of authority, and now refuses to correct his errors." (ECF No. 45 at 26). Defendants Yaplee and Triangle Eye Institute argue that "[t]here are essentially no factual/substantive allegations of civil rights violations or even professional

1 negligence against the moving Defendants, and the factual allegations that *are* present are

2 insufficient to state any claim for relief." (ECF No. 47-1 at 3).

3    Although Plaintiff alleges that he suffers from cloudiness behind the implanted lenses,

4 the TAC contains no allegations that Defendants Yaplee and Triangle Eye Institute's course of

5 treatment was medically unacceptable or that they were deliberately indifferent to a serious

6 medical need. And the Court cannot discern any way in which Plaintiff's civil rights were

7 violated by Defendants Yaplee and Triangle Eye Institute's alleged actions denying Plaintiff's

8 request for free follow-up eyecare after Plaintiff's release from prison as Defendants Yaplee and

9 Triangle Eye Institute were not acting under color of state law.

10    Therefore, Plaintiff fails to state a claim against Defendants Yaplee and Triangle Eye

11 Institute, and their motion to dismiss should be granted.

12                **L.  Amendment of Complaint**

13    Having concluded that Defendants' motions to dismiss should be granted, the Court now

14 turns to the question of whether dismissal should be with or without prejudice. Defendants

15 request that the TAC be dismissed with prejudice given that Plaintiff has failed to plead a viable

16 cause of action after four attempts. (ECF No. 47-1 at 3; ECF No. 51 at 2).

17    The Ninth Circuit has "held that in dismissing for failure to state a claim under Rule

18 12(b)(6), 'a district court should grant leave to amend even if no request to amend the pleading

19 was made, unless it determines that the pleading could not possibly be cured by the allegation of

20 other facts.'" Lopez v. Smith, 203 F.3d 1122, 1127 (9th Cir. 2000) (quoting Doe v. United

21 States, 58 F.3d 494, 497 (9th Cir. 1995)). Under Rule 15(a), the Court "should freely give leave

22 [to amend] when justice so requires," Fed. R. Civ. P. 15(a)(2), and the Ninth Circuit has "noted

23 frequently that the 'rule favoring liberality in amendments to pleadings is particularly important

24 for the pro se litigant. Presumably unskilled in the law, the pro se litigant is far more prone to

25 making errors in pleading than the person who benefits from the representation of counsel.'"

26 Lopez, 203 F.3d at 1131 (quoting Noll v. Carlson, 809 F.2d 1446, 1448 (9th Cir. 1987)).

27 Nonetheless, a court "may exercise its discretion to deny leave to amend due to 'undue delay,

28 bad faith, or dilatory motive on part of the movant, repeated failure to cure deficiencies by

amendments previously allowed, undue prejudice to the opposing party . . . , [and] futility of amendment." <u>Carvalho v. Equifax Info. Servs., LLC</u>, 629 F.3d 876, 892–93 (9th Cir. 2010) (alterations in original) (quoting <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962)).

Here, Plaintiff has had multiple opportunities to amend the complaint. Defendants filed motions to dismiss the Second Amended Complaint that contained relevant legal standards and set forth substantially the same arguments that are raised in the motions to dismiss currently before the Court. Plaintiff had the opportunity to review the previous motions to dismiss and the legal standards and arguments therein before filing the TAC. Plaintiff's repeated failure to cure deficiencies by amendments previously allowed weighs in favor of exercising the Court's discretion to deny leave to amend, but the Court is cognizant that the rule favoring liberality in amendments to pleadings is particularly important for the *pro se* litigant. Accordingly, the Court will grant Plaintiff leave to amend *only* his Eighth Amendment medical care claim regarding the alleged failure to conduct a concussion examination if he believes that additional true factual allegations would state a claim according to the pertinent legal standards provided above.

## V.    CONCLUSION

Accordingly, the undersigned HEREBY RECOMMENDS that:

1. Defendants' motions to dismiss (ECF Nos. 46, 47) be GRANTED;

2. Plaintiff's claims against Defendants CDCR, Alfaro, Kernan, Sullivan, Ortega, Zollinger, Wood, Cimental, Hill, Owolabi, Yaplee, and Triangle Eye Institute be DISMISSED WITH PREJUDICE;

3. Plaintiff's due process claim against Defendant Smith for failure to properly process or respond to grievances be DISMISSED WITH PREJUDICE; and

4. Plaintiff be granted leave to amend his Eighth Amendment medical care claim regarding the alleged failure to conduct a concussion examination.

These Findings and Recommendations will be submitted to the United States District Court Judge assigned to this action pursuant to the provisions of 28 U.S.C. § 636 (b)(1). Within **THIRTY (30) days** after being served with a copy of these Findings and Recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document

should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within **FOURTEEN (14) days** after service of the objections. The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:  **July 18, 2019**          /s/ _Erica P. Grosjean_
                                   UNITED STATES MAGISTRATE JUDGE